## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KRIS ESTRADA,                                    )
c/o Binnall Law Group                            )
717 King Street, Suite 200                       )
Alexandria, Virginia 22314,                      )
                                                 )
     Plaintiff,                          )
                                                 )
v.                                               )    Case No.: _____
                                                 )
                                                 )    **DEMAND FOR JURY**
AMERICAN UNIVERSITY,                             )
c/o Office of General Counsel                    )
3201 New Mexico Avenue, NW                       )
Suite 270                                        )
Washington, D.C. 20016,                          )
                                                 )
and                                              )
                                                 )
BRAD KNIGHT,                                     )
130 M Street NE, Apt. 708                        )
Washington, D.C. 20002,                          )
                                                 )
     Defendants.                         )
_____          )

## COMPLAINT

After freshman Kris Estrada reported that Brad Knight, Assistant Dean of

Undergraduate Education, video-recorded sexual activity without Estrada's consent,

American University turned a blind eye and ignored his complaints. Accordingly, the

University failed to protect Mr. Estrada's rights and allowed the Dean to remain in a

position of authority over other students. Left with no other option, Mr. Estrada files

this Complaint against Defendants for deliberate indifference in violation of Title IX

of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), breach of contract, and intrusion upon seclusion. In support of this Complaint, Estrada states as follows:

<u>Parties</u>

1.      Plaintiff Kris Estrada, at all times relevant to this Complaint, was a resident of the District of Columbia.

2.      Defendant American University (the "University" or "AU") is a private university with its principal place of business located in the District of Columbia.

3.      Defendant Brad Knight, at all times relevant to this Complaint, was a resident of the District of Columbia or regularly transacted business there as a full-time employee of the University.

<u>Jurisdiction and Venue</u>

4.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the laws of the United States including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over the University because it conducts business within the District of Columbia, and the acts giving rise to the Complaint occurred in the District of Columbia.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the University is located in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## Factual Background

## The University

7.      Mr. Estrada enrolled and matriculated as an undergraduate student at the University in the fall semester of 2023, and left the University on June 26, 2025, when he was dismissed for an unrelated disciplinary violation.[1]

8.      At all times in which he was a student, Mr. Estrada was current on tuition payments.

9.      Through its Title IX Sexual Harassment Policy, the University promises it will prohibit sexual harassment, sexual misconduct, and retaliation.

10.      Notably, the University promises this type of prohibited conduct will not be tolerated in any form. University Policy: Title IX Sexual Harassment Policy: Section (II) Policy Statement.

11.      Under this Policy, consent is defined as: "words or conduct indicating a freely given agreement to have sexual intercourse or to participate in sexual activities

---

[1] Mr. Estrada was dismissed following an unrelated disciplinary matter regarding misdemeanor voyeurism charges for which Mr. Estrada pled guilty and was sentenced to limited probation. Coincidentally, Dean Knight committed some of the same conduct (recording people in private situations without their consent), which is the subject of this lawsuit. Unlike its harsh treatment of Mr. Estrada, the University swept the allegations against Dean Knight under the rug.

. . . lack of resistance does not imply consent . . . consent must be on-going." University

Policy: Title IX Sexual Harassment Policy: Section (III)(D).

12.    Sexual harassment is defined as "(1) A University employee

conditioning the provision of a University aid, benefit, or service on an individual's

participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a

reasonable person to be so severe, pervasive, and objectively offensive that it

effectively denies a person equal access to the University's education program or

activity . . . (3) Sexual Assault . . . (4) Dating Violence . . . (5) Domestic Violence . . .

(6) Stalking." University Policy: Title IX Sexual Harassment Policy: Section (III)(J).

13.    In the District of Columbia, these policies constitute contracts between

the University and its students.

14.    This Policy is visible to all, including prospective and current students.

15.    The University also promises, and is required by law, not to discriminate

on the basis of sex.

### History of Mishandling Investigations

16.    The Title IX Office at American University has long been criticized for

mishandling investigations.

17.    The Title IX Office has established a pattern and practice of poor

communication, stonewalling investigations, and abruptly closing cases.

18.    According to *The Eagle*, American University's student newspaper, "AU

students attempting to work with the office have experienced insensitive and

minimal communication from the Title IX office, as well as inconsistent survivor protections." [2]

19.     In 2014, seventy documents detailing sexual violence and drug use by an unrecognized fraternity were leaked, prompting campus outrage.

20.     Students fought for years for a response from the University and Title IX Office, to no avail.

21.     When another student was sexually assaulted in November of 2022, demonstrations and walkouts began.

22.     Additional protests took place in March 2023 and November 2023.

23.     In response to the inaction, the AU Student Government unanimously passed the "Survivor Bill of Rights."

24.     This action also had no effect, as the University refused to enforce it.

25.     In the specific context of faculty-to-student offenses, multiple AU students have reported that the Title IX Office often fails to investigate at all.

26.     Students have often critiqued AU's Title IX policy as insufficient because it does not generally bar faculty-student relationships.

27.     In contrast, almost every other university in the D.C. metropolitan area bars these relationships. These institutions include but are not limited to George

---

[2] The Eagle Editorial Board, "Staff Editorial: AU's Office of Equity and Title IX disrespects survivors and their experiences," *The Eagle* (Dec. 12, 2024) https://www.theeagleonline.com/article/2024/12/staff-editorial-aus-office-of-equity-and-title-ix-disrespects-survivors-and-their-experiences.

Washington University, Georgetown University, Howard University, George Mason University, and the University of Virginia.

28.    The AU Faculty Manual does bar consensual sexual relationships between faculty and students when the faculty member has "a professional or supervisory responsibility" over said student.

29.    Regardless, the Title IX Office avoids investigating professors and other staff members accused of sexual harassment or assault.

30.    In one particularly harrowing example, an AU student reported multiple unwanted sexual and romantic advances from her professor.

31.    In her report, the student alleged that a professor at AU first made sexual advances near the end of Thanksgiving break in 2022. Eventually, the student informed the professor that the advances made her uncomfortable and he apologized. A day later, however, he made further sexual advances.

32.    When she contacted the AU Title IX Office, the Office made representations that it was interested in pursuing an investigation.

33.    Despite this, months passed with no meaningful progress.

34.    Eventually, the AU Title IX Office suddenly dropped the investigation, claiming that the repeated sexual advances were not against University policy.

35.    In 2023, after the investigation was abruptly halted, that same professor was promoted by the University.

36.    This is merely one example of an ongoing pattern of AU Title IX investigation failures, particularly when it comes to faculty-on-student harassment or assault.

37.    Finally, students reported to *The Eagle* that the Title IX Office failed to provide supportive measures, as it was required to do under federal regulations.

38.    One student struggled to get any information at all from the Title IX Office, including its physical location, all while the Title IX Office summarily denied academic support during the resolution of his case.

39.    Another student was constantly subjected to unwanted intrusions from a fellow AU student into her room.

40.    When she asked the Title IX Office for a "No-Contact Order," the Office claimed that she could not obtain one unless the perpetrator physically harmed her, which is not true pursuant to any law or AU's own policies.

**Plaintiff Kris Estrada and Defendant Dean Knight**

41.    After Mr. Estrada enrolled at American University, like all first-year students, he was required to complete the AU Core Curriculum.

42.    Defendant Brad G. Knight ("Dean Knight"), as an Assistant Dean of Undergraduate Education and Senior Director of the AU Core Curriculum, had supervisory authority over first-year students working to fulfill these requirements.

43.    Beyond the AU Core Curriculum, Mr. Estrada was also a member of the "AU Cornerstone" program, which exists to provide students with internship programs and study-abroad opportunities, and the University College Program, a

"living-learning community" offered to first-year students designed to aid their transition to collegiate life.

44.     Dean Knight also had supervisory authority over Mr. Estrada through these programs, as he led the University College program and was a part of the leadership team of AU Cornerstone.

45.     On October 31, 2023, Dean Knight sent Mr. Estrada a personalized email with the subject "Just checking in," formally introducing himself and representing to Mr. Estrada that he led the University College program.

46.     Dean Knight requested any feedback from Mr. Estrada on how his University College experience could be improved.

47.     This email took Mr. Estrada by surprise as it seemed unusual for an administrator to reach out to him personally for feedback.

### The Messages

48.     Mr. Estrada did not hear from Dean Knight again until June 26, 2024, when Dean Knight initiated a conversation over the application Grindr, a dating and chat platform for gay men.

49.     Grindr, unlike other dating apps, does not require both individuals to "like," "swipe," or "match" to speak to one another. Instead, it shows nearby profiles based on proximity.

50.     Therefore, Mr. Estrada had no control over whether Dean Knight could initiate messages to him on this platform.

51.    When Mr. Estrada received the message, he viewed Dean Knight's profile, which indicated that he was married and was on the platform for "chat/friends."

52.    When Mr. Estrada decided to respond to Dean Knight's message, he was under the impression that Dean Knight was using the platform solely for that purpose, since again, Dean Knight indicated that he was married.

53.    Dean Knight was aware that Mr. Estrada was a nineteen-year-old freshman taking summer classes, while Dean Knight was fifteen years older and in a place of authority over Mr. Estrada as a Dean.

54.    The conversation between the two began with what appeared to be innocent introductory messages such as "g'morning" and "pretty good, just having coffee. you?".

55.    Mr. Estrada believed these messages indicated only that Dean Knight wished to check in with a new and stressed-out college student who was a member of several programs Dean Knight oversaw.

56.    Despite this seemingly innocent nature (albeit still strange given that a University administrator was messaging a freshman student on a dating app), the conversation quickly (and perhaps unsurprisingly) became sexual.

57.    Mr. Estrada explained to Dean Knight that he was also having coffee and was "chilling in the library" because he had work to do.

58.    Dean Knight responded with "Good place to (try to) focus." Mr. Estrada responded that he was "still working on that focusing part."

59.    Unprompted, Dean Knight answered that message with "also a good place to cruise I hear."

60.    Mr. Estrada interpreted this message as referencing the library as a good place to engage in sexual relations, as "cruise" is a well-known slang term for sexual activity.

61.    Mr. Estrada was uncomfortable that a Dean with supervisory authority would make such advances to a student, especially involving voyeuristic sex on University property.

62.    Nevertheless, Mr. Estrada responded in kind, but also decided to pivot the conversation back to his work and the general topic of the library, since he was unsure of how he felt about the situation.

63.    Even with this pivot, Dean Knight made another sexually suggestive comment, stating: "maybe one day we'll find ourselves in the library at the same time."

64.    Mr. Estrada did not specifically respond to the message, only "reacting" to it with an emoji.

65.    Dean Knight then asked about Mr. Estrada's paper, and a few more messages were exchanged before the conversation abruptly concluded.

66.    Dean Knight reached back out to Mr. Estrada on July 2, 2024, asking how the paper he was writing on June 26 turned out.

67.    Most of the July 2nd conversation focused on Mr. Estrada's summer classes and schoolwork.

68.    As the conversation progressed, however, it became clear that Dean Knight's "concern" for Mr. Estrada's schoolwork was nothing but pretext for further sexual advances.

69.    The next day, July 3, 2024, Mr. Estrada continued conversing with Dean Knight.

70.     Around 1:00 PM, Dean Knight messaged Mr. Estrada: "Little horny today eh?".

71.    Mr. Estrada, feeling the same as he had previously about the advances, responded with three "shocked" emojis and said "yes" and "..what about you?".

72.    Dean Knight responded, "A little bit."

73.    Mr. Estrada responded with "maybe I could change that," partially believing that the flirtation would end since it was the middle of the workday.

74.    To Mr. Estrada's surprise, Dean Knight stated that "A quick bj could def help me focus at my next meeting."

75.    Mr. Estrada still believed that, while explicit, these messages were nothing more than harmless flirting and would not result in actual sexual activity.

### The Encounter with Dean Knight

76.    Dean Knight then sent Estrada a location, the first-floor restrooms of the Mary Graydon Student Center on campus and asked Mr. Estrada: "You want to suck this cock?".

77.    Mr. Estrada initially agreed to go, but as he arrived, he indicated to Dean Knight that another person was in the restroom.

78.    Dean Knight entered the restroom and proceeded to a different stall.

79.    He then messaged Mr. Estrada that "the location might not work."

80.    Dean Knight then asked if the person left.

81.    At this point, the interruption made Mr. Estrada realize how awkward he felt about the situation.

82.    He realized that he was in an entirely inappropriate situation and felt pressure to continue, given that Dean Knight was his supervisor at school, was fifteen years Mr. Estrada's senior, and they were in public on school grounds.

83.    He then told Dean Knight, "I think it must be the door next to us," "but its just so scary ahah."

84.    Seconds later, once Dean Knight believed the other person had left, he crawled underneath the divider between the stalls, exposing his erect penis and motioning for Mr. Estrada to come to his stall.

85.    Freshman student Mr. Estrada followed Dean Knight's lead.

86.    When Mr. Estrada entered the stall, Dean Knight immediately began grabbing Mr. Estrada's genital area.

87.    After a while, Dean Knight motioned for Mr. Estrada to perform oral sex on him.

88.    When Mr. Estrada was performing oral sex, he saw Dean Knight take out his phone and hold it at his stomach, either recording him or taking photographs.

89.    At no time had Mr. Estrada consented to being recorded or photographed.

90.    Dean Knight had also not asked for Mr. Estrada's consent nor warned Mr. Estrada that he would record him.

91.    After the encounter finished, both Dean Knight and Mr. Estrada left the public University restroom.

92.    Mr. Estrada never heard from Dean Knight again.

93.    Dean Knight's actions constituted sexual harassment because recording a student in a sexual act without their consent is severe, pervasive, and objectively offensive.

### AU's Failure to Investigate

94.    On January 7, 2025, Mr. Estrada's then faculty-advisor reached out to Lauren Stocks-Smith, an Equity and Title IX investigator, to inform her of the incident with Dean Knight.

95.    On January 9, Ms. Stocks-Smith conducted an intake with Mr. Estrada.

96.    In that meeting, Mr. Estrada relayed what happened between him and Dean Knight, stating that although he initially believed a lot of what happened was consensual, it "felt weird" due to the "power dynamic" between the two – essentially, he indicated that he felt coerced into sexual activity.

97.    Mr. Estrada also informed Ms. Stocks-Smith of the recording or photography which was not consensual.

98.    On January 16, Selena Benitez-Cuffee, Title IX Case Manager, emailed Mr. Estrada to ask how he would like to proceed if the University's Title IX Office determined that the conduct as alleged fell within the scope of its policies.

99.    Mr. Estrada informed the Office that he wished to move forward with his formal complaint.

100.    After this email, Mr. Estrada did not hear back from the Title IX Office for two months despite following up in February.

101.    He followed up again on March 19, noting his displeasure with the failure to respond to a formal complaint.

102.    Ms. Laura Buchs, Interim Title IX Coordinator, then responded, stating that the Office was drafting a Notice of Allegations and would be assigning an investigator when one was available.

103.    On April 7, Mr. Estrada received a Notice of Investigation from Ms. Buchs which informed both him and Dean Knight that the Office was commencing an investigation.

104.    Merely four days later, however, Ms. Marissa Abraham, the investigator assigned to Mr. Estrada's case informed him that as an initial matter, she believed that the relationship was not against University policy, but that Mr. Estrada could present contrary evidence in an interview with her.

105.    This quick initial determination seemed to indicate from the outset that the University was ready to believe Dean Knight, without any examination of the evidence.

106.    On April 29, Ms. Abraham requested an interview with Mr. Estrada and asked him to send over any evidence and to be prepared to discuss witnesses.

107.    On May 12, Mr. Estrada submitted a written statement, asserting his belief that the encounter and the recording were coerced and non-consensual.

108.    On May 15, Ms. Abraham interviewed Mr. Estrada, in which he reiterated the same viewpoint.

109.    After the interview, another two months passed without substantial progress and very few updates.

110.    To his surprise, on July 16, Mr. Estrada was informed that his Title IX case was now being investigated by Ms. Laura Buchs, who was still the Interim Title IX Coordinator.

111.    Mr. Estrada was confused as to why, after all this time, the investigation was being handed off to someone else.

### The Dismissal and Appeal

112.    Nine days after this reassignment, on July 25, 2025, Ms. Buchs issued a one-page written "Notice and Dismissal."

113.    Generally, a recipient must investigate the allegations in a formal complaint. 34 C.F.R. §106.45(3)(i).

114.    The Title IX regulations allow for dismissals prior to an investigation in limited circumstances. 34 C.F.R. §106.45(3)(i)-(ii).

115.    A recipient *must* dismiss a complaint "if the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." 34 C.F.R. § 106.45(3)(i).

116.   A recipient *may* dismiss a complaint "if at any time during the investigation or hearing: a complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by the recipient; or specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or the allegations therein." 34 C.F.R. § 106.45(3)(ii).

117.   The regulations do not permit a university to assess the sufficiency of the evidence in deciding whether to dismiss a complaint prior to investigating or prior to a decision.

118.   Despite this limitation, Ms. Buchs issued a dismissal in which she stated that "ETIX conducted an assessment of the potential 'power dynamic' . . . and there was no evidence showing Respondent would have such authority in the future. ETIX also found no evidence of coercion."

119.   In conclusion, Ms. Buchs noted that Mr. Estrada's allegation "does not meet the prima facie threshold."

120.   There is no mention of any type of "prima facie threshold" in the Title IX regulations nor the University's policy.

121.   This dismissal violated the Title IX regulations, as the University improperly assessed the sufficiency of the evidence prior to convening a hearing.

122.   Further contravening the regulations, the University failed to actually investigate Mr. Estrada's formal complaint.

123.    Mr. Estrada faced eight months of stalling in response to reports of sexual harassment by a high-ranking member of the University faculty, and the University engaged in only a perfunctory "investigation."

124.    In truth, the University had no intention of ever actually investigating Dean Knight, fitting the pattern the University has established of turning a blind eye to faculty sexual misconduct.

125.    Mr. Estrada promptly appealed on August 1, 2025.

126.    In his appeal letter, Mr. Estrada pointed out the procedural irregularities as well as the failure to properly analyze his complaint under University policy and its definition of consent.

127.    Mr. Estrada further pointed out that Dean Knight, at the time of the encounter, currently held, and would hold in the future, supervisory authority over Mr. Estrada.

128.    On August 15, 2025, Mr. Estrada reached out to the Title IX Office, formally requesting that the Office review the appeal.

129.    On September 3, 2025, Ms. Amy Krumenacker, the Manager of Employee Relations & Compliance, affirmed the dismissal of the complaint with similar brevity.

130.    Again, in a mere one-page opinion, Ms. Krumenacker summarily denied Mr. Estrada's appeal with little explanation.

131.    Following the appeal, in a final affront, Mr. Estrada was denied access to review and inspect all written materials that were considered by Ms. Krumenacker.

132.    This was another violation of the University's Title IX Sexual Harassment Policy, which guarantees that all written materials considered by University administrators would be subject to inspection by the appealing party. University Policy: Title IX Sexual Harassment Policy: Section IV(K)(7).

**Mr. Estrada's Complaint Under the Faculty Manual is Summarily Denied**

133.    Amid his attempt to initiate a Title IX investigation, Mr. Estrada also pursued a formal complaint under the faculty manual.

134.    The complaint was addressed to Ms. Monica Jackson, Deputy Provost and Dean of Faculty.

135.    The complaint under the faculty manual contained the same information as the Title IX complaint.

136.    Ms. Jackson emailed Mr. Estrada merely two hours later, claiming to have reviewed his complaint and claiming the faculty manual did not cover the conduct alleged because Dean Knight was "not directing a program that you were a participant [in]."

137.    Mr. Estrada, stunned by this assertion, responded by asking how it could be that an Assistant Dean of Undergraduate Education who engaged in sexual activity in a public restroom during work hours with a 19-year-old student had not violated any portion of the faculty manual.

138.    Ms. Jackson responded by asserting that Dean Knight was not a faculty member and explained to him that he should continue with the Title IX Office.

139.    Even if technically true that Dean Knight was not a "faculty" member, the University made no effort to meaningfully investigate him as a staff member either.

140.    Again, through the refusal to even consider this complaint, American University showed it has no interest in investigating sexual misconduct allegations against a member of its staff or faculty.

### American University Finds Dean Knight Not Responsible

141.    Ending the long saga of indifference, on October 21, 2025, the University found Dean Knight "not responsible" for any violation of the "Non-Title IX" Sexual Misconduct Policy.

142.    The University reviewed the evidence substantiating Mr. Estrada's allegation that he and Dean Knight engaged in oral sex in the University public restroom.

143.    Still, the University found that Dean Knight did not commit any violation of University Policy.

144.    Worse, the University found that there were "credibility" issues with Mr. Estrada's testimony, even though his testimony remained consistent that Dean Knight recorded him without his consent.

145.    There were severe credibility issues with Dean Knight.

146. Shockingly, Dean Knight denied ever meeting or engaging in sexual contact with Mr. Estrada, despite authentic screenshots showing otherwise.

147. Further, Dean Knight claimed that he was "impersonated" and not on campus the day of the incident.

148. Such a claim was easily falsifiable, if the University would have bothered to investigate (such as by reviewing surveillance footage to verify whether he was on campus or not).

149. If the University had done so, Dean Knight even being on campus would have been fatal to any creditability determinations in favor of Dean Knight.

150. Even without an investigation, the University noted that the evidence supporting Dean Knight's theory of being impersonated is "weak."

151. The University's refusal to find Dean Knight less credible than Mr. Estrada was yet another manifestation of their deliberate indifference and refusal to act on Mr. Estrada's complaint.

### Dean Knight's Disassociation and
### Further Student Complaints for the Title IX Office

152. In response to the University's latest error, Mr. Estrada, through counsel, sent a demand letter to the University on October 28, 2025.

153. His letter outlined all pertinent facts germane to his claims against the University.

154. Curiously, following this disclosure of facts and claims, Dean Knight became disassociated with the University as of December 4, 2025.

155.    Following his disassociation as a faculty member, he still remains on the American University Law Review's Volume 75 Masthead, and his public Substack and LinkedIn profile show his enrollment as an American University Law Student with an expected graduation date of May 2027.

156.    On December 11, 2025, another article appeared in an American student publication, *American Way of Life* (AWOL), criticizing the University's Title IX response.

157.    The article concerned a Title IX complaint containing several allegations of sexual misconduct against a single professor.

158.    This article recounted how the Title IX Office again discarded its responsibilities by "ultimately refer[ring] reports to AU's HR Office and the dean of faculty or dismissed the reports."

159.    Notably, the same method was employed in Mr. Estrada's matter.

160.    Another student claimed she "never received a copy of the report she filed despite asking the university repeatedly for a copy of the incident report."

161.    This incident is another similarity to Estrada's case, and further evidence of the University's pattern and practice of failing to investigate faculty members who are accused of sexual misconduct.

## <u>Causes of Action</u>

### COUNT I
### <u>TITLE IX DELIBERATE INDIFFERENCE</u>
### (Against the University)

162.    Mr. Estrada incorporates by reference the above paragraphs.

163.    Title IX prohibits all discrimination on the basis of sex in educational institutions receiving federal funds.

164.    The University receives federal funds.

165.    This prohibition includes discrimination that takes the form of deliberate indifference to sexual harassment.

166.    To prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must satisfy five elements. First, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive ... that the victim-students are effectively denied equal access to an institution's resources and opportunities." Second, an official with authority to address the harassment must have "actual knowledge" of that harassment. Third, the recipient must have "substantial control over both the harasser and the context in which the known harassment occurs." Fourth, the recipient's response or failure to respond must amount to "deliberate indifference to known acts of harassment." Fifth, that "deliberate indifference" must "'subject[ ]' its students to harassment." "That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Doe v. Columbia*, 151 F.4th 435, 446 (D.C. Cir. 2025) (internal citations omitted).

167.    Here, Mr. Estrada was subjected to harassment based on his sex in the form of a recording taken without his consent of sexual activity between him and Dean Knight.

168.    The harassment was sufficiently severe, pervasive, and objectively offensive; it resulted in the loss of educational benefits in the form of Mr. Estrada's student organization memberships lasting up to his departure from the University, his struggles to complete schoolwork, and his struggles to attend classes during that time.

169.    The University had actual knowledge of the harassment because Mr. Estrada filed multiple reports and Title IX complaints.

170.    The University had substantial control over Dean Knight because Dean Knight was a full-time employee of the University.

171.    The University also had substantial control over the context in which the harassment occurred: a public restroom in the University's sole student center on campus.

172.    The University's actions amounted to deliberate indifference because it acted in a manner clearly unreasonable under the circumstances by utterly refusing to take any action against Dean Knight.

173.    Among the many options, the University could have substantially investigated Dean Knight; it could have removed him from his position of authority over undergraduate students; it could have developed policies to prevent this type of

harassment; it could have publicly discouraged and denounced this type of harassment. At the very least, it could have engaged in *some* form of investigation.

174.    Instead, it took no action to protect Mr. Estrada and other University students.

175.    Finally, the deliberate indifference made Mr. Estrada vulnerable to further harassment because Dean Knight, absent even the slightest penalty, was free to circulate the video recording or photographs, or otherwise contact Mr. Estrada for additional sexual activity.

176.    As a direct result of the University's deliberate indifference to the harassment he endured, Mr. Estrada suffered and continues to suffer damages.

**COUNT II**
**BREACH OF CONTRACT**
**(Against the University)**

177.    Mr. Estrada incorporates by reference the above paragraphs.

178.    In the District of Columbia, a university's policies are contracts with its students.

179.    Through its Title IX Sexual Harassment Policy, the University promises it will prohibit sexual harassment, sexual misconduct, and retaliation.

180.    Notably, the University indicates and promises that this type of prohibited conduct will not be tolerated in any form.

181.    Through these promises, the University created a contractual duty to its students that it must uphold.

182.    By failing to investigate Dean Knight, the University breached its contract with Mr. Estrada through violating its promise to prohibit sexual harassment and misconduct, instead tolerating it by allowing Dean Knight to escape unaffected.

183.    In fact, the University took no action at all to protect Mr. Estrada.

184.    As a direct result of the University's breach, Mr. Estrada suffered and continues to suffer damages.

**COUNT III**
**INTRUSION UPON SECLUSION**
**(Against Brad Knight)**

185.    Mr. Estrada incorporates by reference the above paragraphs.

186.    Intrusion upon seclusion includes three elements under DC law: (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person.

187.    Dean Knight invaded or interfered by filming Mr. Estrada without consent.

188.    When Dean Knight filmed Mr. Estrada, he was engaged in intimate sexual activity, which is fundamentally a private or secret concern.

189.    Mr. Estrada was easily identifiable while Dean Knight filmed him from above, given that Mr. Estrada's face was visible as he engaged in sexual activity and made brief eye contact with Dean Knight's phone camera.

190.    The non-consensual filming of intimate sexual activity would be highly offensive to any reasonable person.

191.    By filming Mr. Estrada without his consent, Dean Knight violated Mr. Estrada's privacy and caused him to suffer damages.

### Jury Demand

Plaintiff, Kris Estrada, demands a trial by jury.

### Prayer for Relief

WHEREFORE, Plaintiff, Kris Estrada, demands judgment against Defendant American University and Defendant Brad Knight, as follows:

a.  An award of compensatory, special, and punitive damages in an amount to be proven at trial;

b.  Injunctive relief directing the University to investigate Mr. Estrada's complaints and comply with Title IX as applied to Mr. Estrada's formal complaints;

c.  An award of Mr. Estrada's costs associated with this action, including but not limited to his reasonable attorneys' fees and expenses; and

d.  Such other and further relief as the Court deems just and appropriate.


Dated: February 25, 2026                    Respectfully submitted,

                                            */s/ Lindsay R. McKasson*
                                            Lindsay R. McKasson
                                            D.C. Bar No. 1618740
                                            Parker Bowman
                                            (Court membership pending)
                                            BINNALL LAW GROUP, PLLC

717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
lindsay@binnall.com
parker@binnall.com

*Counsel for Plaintiff Kris Estrada*