# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KRIS ESTRADA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:26-cv-00603-ABJ |
| | ) | |
| AMERICAN UNIVERSITY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT AMERICAN UNIVERSITY'S MOTION TO DISMISS

Parker Bowman, VA227
Lindsay R. McKasson
D.C. Bar No. 1618740
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
parker@binnall.com
lindsay@binnall.com

*Counsel for Plaintiff Kris Estrada*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

BACKGROUND .............................................................................................................1

ARGUMENT ..................................................................................................................7

    I.   Legal Standard. ....................................................................................................7

    II.  Mr. Estrada Stated a Prima Facie Case of Deliberate Indifference..................7

        A.    Mr. Estrada Plausibly Alleged Severe and Ongoing Harassment..........9

        B.    Mr. Estrada Has Plausibly Alleged that the University Was Deliberately Indifferent to His Harassment. ...........................................................16

        C.    Mr. Estrada Has Plausibly Alleged that the University's Inaction Left Him Vulnerable to Additional and Ongoing Harassment.....................22

    III. Mr. Estrada Has Adequately Pledged a Breach of Contract Between Himself and the University. ........................................................................................26

    IV. Dismissal with prejudice is improper.............................................................31

CONCLUSION .............................................................................................................33

CERTIFICATE OF SERVICE ....................................................................................34

# TABLE OF AUTHORITIES

### Cases

*Air Excursions LLC v. Yellen,*
  66 F.4th 272, 277 (D.C. Cir. 2023) ...............................................................................7

*Ashcroft v. Iqbal,*
  556 U.S. 662, 678 (2008) .............................................................................................7

*Banneker Ventures, LLC v. Graham,*
  798 F.3d 1119, 1133 (D.C. Cir. 2015) .......................................................................26

*Basch v. George Washington Univ.,*
  370 A.2d 1364, 1367 (D.C. 1976)...............................................................................27

*Cavalier v. Catholic Univ. of Am.,*
  306 F. Supp. 3d 9 (D.D.C. 2018) ...................................................................16, 17, 21

*Chenari v. George Washington Univ.,*
  172 F. Supp. 3d 38, 47 (D.D.C. 2016) .......................................................................26

*Davis v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629, 643-51 (1999) .............................................................8, 9, 10, 13, 16

*Dentons US LLP v. Republic of Guinea,*
  208 F. Supp. 3d 330, 338 (D.D.C. 2016) ...................................................................31

*Doe v. American Univ.,*
  No. 19-cv-03097 (APM),
  2020 WL 5593909, at *11 (D.D.C. Sept. 18, 2020)....................................27, 28, 30

*Doe v. George Wash. Univ.,*
  369 F. Supp. 3d 49, 88 (D.D.C. 2019) .........................................................................8

*Doe v. Howard University,*
  396 F. Supp. 3d 126, 133-34 (D.D.C. 2019) .......................................................22, 23

*Farmer v. Kan. State Univ.,*
  918 F.3d 1094 (10th Cir. 2019) ............................................................................24, 25

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274, 290 (1998) ..................................................................................8

*Manago v. District of Columbia*,
   934 A.2d 925, 927 (D.C. 2007)........................................................................26

*Pride v. Howard Univ.*,
   384 A.2d 31, 34 (D.C. 1978).............................................................................27

*Raihan v. George Washington University*,
   324 F. Supp. 3d 102, 111 (D.D.C. 2018) ..............................................13, 14, 17

*Robinson v. Howard Univ., Inc.*,
   335 F. Supp. 3d 13, 28 (D.D.C. 2018) .............................................................9

*Rudder v. Williams*,
   666 F.3d 790, 794, (D.C. Cir. 2012) ................................................................31

*T.Z. v. City of N.Y.*,
   634 F. Supp. 2d 263, 270-71 (E.D.N.Y. 2009) ..............................10, 15, 32

*Tsintolas Realty Co. v. Mendez*,
   984 A.2d 181, 187 (D.C. 2009)........................................................................26

*Tubbs v. Stony Brook University*,
   2016 U.S. Dist. LEXIS 28465 at *7 (D. N.Y. 2016)...........................17, 18

*Weatherly v. Second Nw. Coop. Homes Ass'n*,
   304 A.3d 590, 595 (D.C. 2023).........................................................................26

*Williams v. Board of Regents of the University System of Georgia*,
   477 F.3d 1282, 1297 (11th Cir. 2007) ................................................17, 18

### Statutes

D.C. Code § 22-3531(c)(1)(C).................................................................................11

D.C. Code § 7-2162 ................................................................................................11

### Other Authorities

*Peer*,        MERRIAM-WEBSTER        DICTIONARY,        https://www.merriam-webster.com/dictionary/peer (last visited April 2, 2026) ........................................14

### Rules

Fed. R. Civ. P.  12(b)(6) ..............................................................................................7

Defendant American University's Motion to Dismiss and accompanying Memorandum in Support rest on a selective and incomplete characterization of Mr. Estrada's allegations. At its core, this case is not merely about a single sexual encounter—it is about the non-consensual recording and continued retention of sexually explicit images of a student by a university official, and the University's failure to meaningfully address that ongoing violation. This failure is not a past, isolated event. The continued existence and potential dissemination of those images constitute an ongoing harm, rendering Mr. Estrada vulnerable to further harassment and reputational injury. The University's inaction in the face of such allegations plausibly constitutes deliberate indifference under Title IX and is sufficient to survive a motion to dismiss.[1]

## BACKGROUND

### A. Mr. Estrada's Time at American University.

Plaintiff Kris Mr. Estrada enrolled and matriculated as an undergraduate student at Defendant American University (hereinafter "Defendant" or "University") in the fall semester of 2023. ECF No. 1 at ¶ 7 (hereinafter "Compl."). Mr. Estrada left the University on June 26, 2025, when he was expelled for an unrelated disciplinary violation.[2] Compl. ¶ 7.

---

[1] Plaintiff concedes that he is not entitled to punitive damages on his claims. As such, he will not address that section of the Defendant's argument.

[2] Defendant's Memorandum contains a similar footnote to what was contained in Mr. Estrada's Complaint. See ECF No. 9 at 1; Compl. ¶ 7 fn.1. Defendant's footnote

### B. American University's History of Deliberate Indifference.

By the time Mr. Estrada arrived at the University, Defendant had long been criticized for its wholly inadequate response when investigating faculty. Compl. ¶¶ 16-40. Numerous pieces were released by *The Eagle*, the University's student newspaper, detailing multiple students being functionally ignored by the University whenever they filed Title IX complaints against faculty. *Id.* The years of inaction gave way to protests and walkouts, including a protest in November 2023, shortly after Mr. Estrada matriculated. Compl. ¶ 21.

### C. Mr. Estrada Meets Dean Knight.

When Mr. Estrada arrived at the University, like all first years, he was required to complete the AU Core Curriculum. Compl. ¶ 41 Defendant Brad Knight (hereinafter "Dean Knight") had supervisory authority over the AU Core Curriculum. Compl. ¶ 42. Dean Knight also had supervisory authority over Mr. Estrada through the AU Cornerstone program. Compl. ¶ 43.

Dean Knight's first contact with Mr. Estrada was a personalized email with the subject "Just checking in," with which he formally introduced himself and represented to Mr. Estrada that he led the University College program. Compl. ¶ 45.

---

heavily implies that Mr. Estrada's good faith complaints were an attempt to escape his own disciplinary matter. This footnote, in fact, is a shocking admission that proves Mr. Estrada's point. The Defendant never took his complaints seriously. Instead, Defendant, from the moment it received his complaints, had already made up its mind that Mr. Estrada was not credible. It does not logically follow, as Defendant seems to suggest, that Mr. Estrada could not have also been the victim of sexual assault himself because of his voyeurism charges.

2

### D.  Dean Knight Reaches out to Mr. Estrada on Grindr.

On June 26, 2024, Dean Knight messaged Mr. Estrada on Grindr, a dating and chat platform for gay men. Compl. ¶ 48. When Mr. Estrada received the message, he viewed Dean Knight's profile, which indicated that he was married and was on the platform to just meet friends. Compl. ¶ 51. Thus, when Mr. Estrada chose to respond to Dean Knight, he truly believed that Dean Knight was reaching out just for that purpose, considering Dean Knight was married. Compl. ¶ 52. Dean Knight's messages with Mr. Estrada quickly turned sexual after exchanging pleasantries. Compl. ¶¶ 56-64.

On July 2, 2024, Dean Knight reached out to Mr. Estrada again, asking how his assignments from June 26 had progressed. Compl. ¶ 67. On July 3, Dean Knight and Mr. Estrada continued conversing. Compl. ¶ 69. Again, Dean Knight quickly turned the conversation sexual, asking Mr. Estrada: "Little horny today eh?" Compl. ¶ 70. Despite Mr. Estrada feeling uncomfortable with the messages, he responded in kind, and the messages continued to escalate. Compl. ¶¶ 71-75.

### E.  The Encounter with Dean Knight.

Eventually, Dean Knight sent Mr. Estrada a location, the first-floor bathrooms of the Mary Graydon Center on campus. Compl. ¶ 76. Mr. Estrada agreed to go but indicated to Dean Knight that someone else was in the bathroom. Compl. ¶ 77. Both waited in separate stalls, and eventually Dean Knight asked if the other person left. Compl. ¶¶ 78-80. The waiting allowed Mr. Estrada to realize how uncomfortable he was with the situation, but he began to fear the consequences for backing out. Compl.

3

¶¶ 81-82. Mr. Estrada attempted to exit the situation by messaging Dean Knight "I think it must be the door next to us," "but its [sic] just so scary ahah." Compl. ¶ 83.

Seconds later, undeterred by Mr. Estrada's last message, Dean Knight climbed under the divider, exposed his erect penis, and motioned for Mr. Estrada to join him. Compl. ¶ 84. As soon as Mr. Estrada entered Dean Knight's stall, Dean Knight grabbed his genital area. Compl. ¶ 86. After a while, Dean Knight motioned for Mr. Estrada to perform oral sex. Compl. ¶ 87. While Mr. Estrada was doing so, he saw Dean Knight take out his phone and either record or take pictures of him. Compl. ¶ 88. Mr. Estrada never consented to being recorded or photographed. Compl. ¶ 89. Mr. Estrada never heard from Dean Knight again. Compl. ¶ 92.

### F.  The University's Failure to Investigate.

In January of 2025, Mr. Estrada's faculty-advisor reached out to Lauren Stocks-Smith to inform her of the incident with Dean Knight. Compl. ¶ 94. Two days later, Stocks-Smith conducted an intake. Compl. ¶¶ 95-97. Mr. Estrada indicated that he initially believed what happened was consensual but weird due to a power dynamic. *Id.* Essentially, Mr. Estrada was telling Stocks-Smith that he felt coerced into sexual activity. *Id.* He also made it exceedingly clear that he never consented to any recording or photography. *Id.*

Mr. Estrada's next contact with the Title IX office came a week later, when Selena Benitez-Cuffee emailed Mr. Estrada to ask how he would like to proceed if the office determined that the conduct as alleged fell within the scope of the office's policies. Compl. ¶ 98. Unbeknownst to Mr. Estrada, this would be his last contact

4

with the Title IX office for two months. Compl. ¶ 100. On March 19, Mr. Estrada conveyed his displeasure with the failure to respond to a formal complaint. Compl. ¶ 101. Laura Buchs, responded, stating that the office was drafting a Notice of Allegations and assigning an investigator when possible. Compl. ¶ 102.

Mr. Estrada received the Notice of Investigation from Buchs on April 7. Compl. ¶ 103. Merely four days later, the investigator, illustrating her preconceived bias, told Mr. Estrada that he could present evidence in an interview but that she already did not believe the relationship was against University policy. Compl. ¶ 104. This quick initial determination, after months of inactivity, indicated from the outset that the University was ready to believe Dean Knight. Compl. ¶ 105.

Mr. Estrada was interviewed on May 15. Compl. ¶ 108. After this interview, Mr. Estrada received two more months of silence, Compl. ¶ 109. Then, on July 16, Mr. Estrada was informed that Laura Buchs was now investigating his complaint, which caused much confusion regarding why the investigation would be handed off to someone else. Compl. ¶¶ 110-111.

### G. The University's Dismissal of Mr. Estrada's Complaint and Appeal.

Nine days later, Buchs issued a one-page written "Notice and Dismissal." Compl. ¶ 112. The Title IX regulations do not permit a university to assess the sufficiency of the evidence in deciding whether to dismiss a complaint prior to investigating or prior to a decision. Compl. ¶ 117. Despite this limitation, Buchs issued a dismissal in which she stated that "ETIX conducted an assessment of the potential 'power dynamic' . . . and there was no evidence showing Respondent would

5

have such authority in the future. Compl. ¶ 118. Buchs further noted that Mr. Estrada's allegation "does not meet the prima facie threshold." Compl. ¶ 119. No prima facie threshold is mentioned in the Title IX regulations or University policy. Compl. ¶ 120. Mr. Estrada appealed this determination on August 1. Compl. ¶ 125. On September 3, Amy Krumenacker, the Manager of Employee Relations & Compliance, affirmed the dismissal of the complaint in a mere one-page opinion. Compl. ¶ 129.

### H. The University Finds Dean Knight Not Responsible.

Adding insult to injury, on October 21, the University found Dean Knight "not responsible" for any violation of the "non-Title IX" sexual misconduct policy. Compl. ¶ 141. Despite reviewing the screenshots and screen recordings substantiating the fact that Mr. Estrada gave Dean Knight oral sex in the University public bathroom, the University found he did not violate any policy. Compl. ¶¶ 142-143. Beyond that, the University found that there were "credibility" issues with Mr. Estrada's testimony, even though his testimony remained consistent that Dean Knight recorded him without his consent. Compl. ¶ 144.

Defendant Dean Knight, for his part, had severe credibility issues. Compl. ¶ 145. Dean Knight shockingly denied ever engaging in sexual contact with Mr. Estrada, even though the screenshots and screen recordings were authentic and proved otherwise.  Compl. ¶ 146. Worse, Dean Knight claimed that he was impersonated. Compl. ¶ 147. This claim was so patently ridiculous, that even the University, which had clearly shown its bias in favor of Dean Knight, concluded the

evidence supporting such a theory was "weak." Compl. ¶ 150. Even still, the University's refusal to say that Dean Knight was less credible than Mr. Estrada was just another manifestation of their deliberate indifference. Compl. ¶ 151.

## ARGUMENT

### I. Legal Standard.

A motion under Rule 12(b)(6) tests whether the complaint states "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2008). To survive a 12(b)(6) motion, a complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When a defendant brings a 12(b)(6) motion, the Court does not resolve factual disputes; rather, when a complaint states well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S., at 679. The Court "accept[s] the well-pleaded factual allegations as true and draw all reasonable factual inferences from those allegations in the plaintiff's favor." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (internal citations omitted).

### II. Mr. Estrada Stated a Prima Facie Case of Deliberate Indifference.

Mr. Estrada plausibly stated a prima facie case of deliberate indifference to sexual harassment because he can establish that the harassment he faced was (1) sufficiently severe, pervasive, and objectively offensive, (2) the University was

7

deliberately indifferent to known acts of sexual harassment, and (3) the University's

deliberate indifference caused him to endure ongoing harassment, as well as remain

vulnerable for further harassment in the future.

In two seminal cases, the Supreme Court holds that a university is liable for

damages under Title IX for deliberate indifference to known acts of harassment if the

plaintiff can show:

> (1) the university had "actual knowledge" of the sexual harassment or
> discrimination; (2) the university "exercise[d] substantial control over
> both the sexual harasser and the context in which the known
> harassment occur[red]"; (3) the sexual harassment complained of was
> "so severe, pervasive, and objectively offensive that it can be said to
> deprive the victims of access to the educational opportunities or benefits
> provided by the school"; and (4) the university was "deliberately
> indifferent to [the known acts of] sexual harassment""[A] damages
> remedy will not lie [against a university] under Title IX," however,
> unless a plaintiff can demonstrate that "an official who at minimum
> ha[d] authority to address the alleged discrimination and to institute
> corrective measures on the [university]'s behalf ha[d] actual knowledge
> of the discrimination in the [university]'s programs and fail[ed]
> adequately to respond.

*Doe v. George Wash. Univ.*, 369 F. Supp. 3d 49, 88 (D.D.C. 2019) (citing *Davis v.*

*Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643-51 (1999); *Gebser v. Lago Vista Indep.*

*Sch. Dist.*, 524 U.S. 274, 290 (1998)).

More recently, the D.C. Circuit restated the elements as (1) harassment that

is so severe, pervasive, and objectively offensive that it denies educational

opportunities or benefits; (2) an official, who possesses the authority to address the

harassment has "actual knowledge" of it; (3) substantial control over both the

harasser and the context in which the known harassment occurs; (4) the institution's

response or failure to act amounts to "deliberate indifference; and (5) that deliberate indifference causes students to undergo harassment or make them liable or vulnerable to it. *Doe v. District of Columbia*, 151 F.4th 435, 446 (D.C. Cir. 2025).

Defendant correctly points out that "[d]eliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault. *See* ECF No. 9 at 9; *Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 28 (D.D.C. 2018). Defendant is likewise correct that, as stated by the Supreme Court in *Davis*: "In an appropriate case, there is no reason why courts, on a motion to dismiss could not identify a response as not 'clearly unreasonable' as a matter of law." *See* ECF No. 9 at 9; *Davis* 526 U.S. at 649.

Here, as will be shown below, Mr. Estrada's case mirrors exactly the case in which a school has ignored a victim's complaint of sexual harassment. Defendant only contests three of the five elements necessary to make out a prima facie case in its memorandum. ECF No. 9 at 9. Mr. Estrada will examine each contested element in turn in the following sections.

### A.    Mr. Estrada Plausibly Alleged Severe and Ongoing Harassment.

Although Mr. Estrada only alleges one sexual encounter with the University's employee who had authority over Mr. Estrada, Mr. Estrada still meets the severe and pervasive harassment by alleging that the incident itself is so serious, and contains three separate independent acts, so that it alone can meet the severe and pervasive standard. Furthermore, Mr. Estrada alleges that the harassment continues to this day, precisely because of Defendant's failure to act.

9

Satisfying the severe and pervasive element requires Mr. Estrada to plausibly plead facts that he faced "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Notably, "[a] single, serious sexual assault can meet the severe, pervasive, and offensive standard." *See, e.g. T.Z. v. City of N.Y.*, 634 F. Supp. 2d 263, 270-71 (E.D.N.Y. 2009). Although *Davis* provided "isolated incidents are unlikely to create the 'systemic effect' necessary to trigger liability, it also stated the "systemic effect," differs when considering "peer harassment" as opposed to "teacher-student harassment." *Davis*, 526 U.S. at 633. "Peer harassment . . . is not as likely as teacher-student harassment to have the 'systemic effect' on educational access necessary to create liability, especially if there is only one incident of harassment." *Id.* In other words, when a teacher or University sexually harasses a student, it is more likely to be a systemic issue and can therefore create liability for the University.

### 1. *Mr. Estrada alleged Three Ongoing Harms.*

The University's argument that Mr. Estrada did not complain of harassment that was "so severe, pervasive, and objectively offensive . . . that the victim [is] effectively denied equal access to an institution's resources and opportunities" (ECF No. 9 at 8-9) misses the mark by disregarding what Mr. Estrada actually alleged. Likewise, the University reduces Mr. Estrada's allegations to a "single incident" of sexual conduct between Mr. Estrada and Dean Knight in the University bathroom. That framing is problematic as it suggests that a Dean who has authority over a

student can have a sexual encounter on University property, film it without the student's consent, and the University does not have to fully investigate such conduct. This framing also misses key allegations by Mr. Estrada. Namely, he alleged three harassing acts by Defendant Dean Knight that the University failed to address: (1) Dean Knight used his position of authority to coerce Mr. Estrada into sexual activity; (2) Dean Knight recorded and/or photographed Mr. Estrada during that encounter without Mr. Estrada's consent; and (3) Dean Knight retained the results of that recording and/or photography without consent. *See* Compl. ¶¶ 88-90; 93; 96-97; 107-108; 144; 167; 175; 187-191.

These allegations are critical for at least two reasons. First, it renders Dean Knight's actions, which the University declined to address, far more severe. Second, it turns what the University describes as a singular act into a continuous, ongoing act.

The University repeatedly quotes Mr. Estrada's Complaint to reiterate that Mr. Estrada "never heard from Dean Knight again" after their sexual encounter. *See, e.g.* ECF No. 9 at 10, 11, 14. The University frames Mr. Estrada's allegations in this manner in hopes of diminishing the severity of Dean Knight's actions. It is a crime in the District of Columbia to "electronically record, without the express and informed consent of the individual being recorded, an individual who is . . . engaging in sexual activity." D.C. Code § 22-3531(c)(1)(C). Similarly, D.C. Code § 7-2162 establishes an analogous civil cause of action. Put simply, Mr. Estrada alleged Dean Knight committed two separate criminal sexual acts, while retaining the ability to commit a

third. The severity of such acts becomes plainly apparent when considering that Dean Knight currently possesses the ability to harm Mr. Estrada by retaining sexually explicit images and/or recordings of him, presumably to this day.

Despite informing the appropriate officials of the illicit, non-consensual recording of a sexual act by one of its own employees, the University failed to pursue any corrective action. The University did not involve the police, as it did when Mr. Estrada himself was reported for taking illicit photographs. It seemingly took no steps at all to locate or prove the existence of such recordings. Instead, it performed a perfunctory, low effort "investigation" of the matter to attempt to wash its hands of responsibility for the criminal acts of its employee.

After attempting to diminish the severity of Dean Knight's actions to justify its own inaction, the University claims that it had no responsibility to act precisely because Dean Knight's acts were an isolated incident. *See* ECF No. 9 at 11 (citing *Raihan,* 324 F. Supp. 3d. at 113). Again, however, Dean Knight committed three separate acts, not just one. He not only had a sexual encounter with Mr. Estrada (a freshman student), but also recorded him, and presumably *kept* the same recordings. This retention of illicit material is an ongoing and continuously ignored act that satisfies the pervasiveness requirement under *Davis*.

### 2. *A University Employee Recording a Student Committing a Sexual Act without their Consent is Severe.*

The University's chiefly relies on *Raihan v. George Washington University* to make its argument as to the severe and pervasive element. In this context, however,

12

its reliance on *Raihan* is misplaced because that case is distinguishable from Mr. Estrada's action. In *Raihan*, the plaintiff alleged George Washington University had not acted quickly enough when she still ran into her assaulter at the University gym, despite a no-contact order. 324 F. Supp. 3d 102, 111 (D.D.C. 2018). The plaintiff claimed this single incident barred her access to the gym permanently. *Id.* The court found this argument unconvincing. In opining on the meaning of "severe, pervasive, and objectively offensive," the court stated "seeing one's abuser in a campus gym is not 'pervasive' harassment or a 'systemic' denial of educational benefits." *Id.* at 114.

Even if one were to define Mr. Estrada's sexual encounter with Dean Knight as an "isolated incident," it cannot be seriously contended that "seeing one's abuser in a campus gym" is the same as what occurred with Mr. Estrada. Comparing allegations of sexual assault and the non-consensual recording of that assault to happening to run into your abuser in a public place is plainly ridiculous. On its face, the severity difference alone is palpable.

This difference is not the only reason *Raihan*, and even the line of cases produced by *Davis* itself, are distinguishable from Mr. Estrada's situation. *Davis* and its progeny were concerned chiefly with "peer harassment." "Peer harassment, the Court explained, is not as likely as teacher-student harassment to have the "systemic effect" on educational access necessary to create liability, especially if there is only one incident of harassment." *Raihan*, 324 F. Supp. 3d at 108 (citing *Davis*, 526 U.S. at 652-653). Defendant conveniently ignores this bedrock principle of *Davis*, and how it applies to this case.

13

Dean Knight is not Mr. Estrada's "peer" and his relationship with Mr. Estrada resembles the "teacher-student" relationship that *Davis* recognized as more inherently likely to have a "systemic effect" on educational access. "Peer" is defined as "one that is of equal standing with another; especially one belonging to the same societal group especially based on age, grade, or status." *Peer*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/peer (last visited April 2, 2026). At the time of the sexual encounter, Mr. Estrada was a nineteen-year-old freshman taking summer classes, while Dean Knight was fifteen years older and a Dean of Undergraduate Education. *See* Compl. ¶¶ 53, 82. Given that Dean Knight was not merely Mr. Estrada's peer, the relationship carried inherent systemic risks that made a "single incident" much more severe as compared to peer harassment. For this reason, *Raihan* is also inapposite.

The University's argument hinges on ignoring the critical fact that Dean Knight recorded Mr. Estrada performing oral sex on Dean Knight and presumably retained the resulting images and/or videos. Because a University official directly entrusted with Mr. Estrada's success and well-being took and retained compromising images and videos, Mr. Estrada was placed in a wholly unique circumstance unlike any faced by his classmates. Dean Knight could have released his illegally obtained photos and/or videos at any time. Mr. Estrada was therefore subject to extremely severe, pervasive, and ongoing harassment that denied him equal access to the University's resources and opportunities. Moreover, because this situation is more akin to "teacher-to-student harassment," rather than "peer harassment," the actions

14

taken by Dean Knight are far more severe, given the inherent systemic risks the encounter carried. Defendant's arguments on element one fail.

### 3. *This single incident rises to the same level as a "single, serious, sexual assault."*

Yet, even if one remains unconvinced by the preceding arguments, "[a] single, serious sexual assault can meet the severe, pervasive, and offensive standard." *See, T.Z.*, 634 F. Supp. at 270-71. Here, this is exactly what Mr. Estrada alleges. *See* Compl. ¶¶ 96, 107-108.

To be clear, and reiterate what was stated above, Mr. Estrada alleged three harassing acts by Defendant Dean Knight that the University failed to address: (1) Dean Knight used his position of authority to coerce Mr. Estrada into sexual activity; (2) Dean Knight recorded and/or photographed Mr. Estrada during that encounter without Mr. Estrada's consent; and (3) Dean Knight retained the results of that recording and/or photography without consent. *See* Compl. ¶¶ 88-90; 93; 96-97; 107-108; 144; 167; 175; 187-191.  That is, Mr. Estrada alleged Dean Knight (1) sexually assaulted him; (2) recorded and/or photographed the assault; and (3) still retains the recording and/or photographs to this day.

The idea that such an assault is not so "severe" as to meet the severe and pervasive standard is plainly ridiculous. Again, one wonders if the University would make the same argument had a female student alleged the exact same conduct. Regardless, the University's' insistence on diminishing as "just one" incident of harassment proves his entire point. The University never took Mr. Estrada's

allegations seriously, despite their grave nature, and the argument they present before this Court all but admits it.

### B.    Mr. Estrada Has Plausibly Alleged that the University Was Deliberately Indifferent to His Harassment.

Mr. Estrada plausibly alleged that the University, through months of stalling and inaction, was deliberately indifferent to his harassment. "A recipient is 'deliberately indifferent to . . . student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Doe*, 151 F.4th at 446-447 (quoting *Davis*, 526 U.S. at 648). "Deliberate indifference is a 'high standard' that requires more than a showing of mere negligence." *Id.* at 446 (citing Davis, 526 U.S. at 642-43). Notably, this language is again couched in the "student-on-student" harassment scenario, and the Defendant's citations of Davis's language omit such references. *See* ECF No. 9 at 11-12. In sum, this standard, can be described as "an official decision by the recipient not to remedy the violation." Here, Mr. Estrada alleges the University was deliberately indifferent by alleging both a substantial and unexplainable delay in addition to procedural irregularities and deficiencies.

### 1.    *The University Substantially and Unexplainably Delayed Mr. Estrada's Complaint against Dean Knight.*

Although Mr. Estrada pleads more than just the University's delay, in at least one court the delay alone was sufficient for this element. In *Cavalier*, this Court held that allegations of substantial and unexplainable delays were enough to clear the motion to dismiss stage on a deliberate indifference claim. *See generally Cavalier v.*

16

*Catholic Univ. of Am.*, 306 F. Supp. 3d 9 (D.D.C. 2018). "Although a close question, the Court concludes that Cavalier has alleged enough—although just enough—to clear the motion to dismiss hurdle." *Id.* at 31. "A four-and-a-half month delay is substantial, and Gregory and Callis had completed their supplemental investigation by April 23, 2013—leaving an unexplained delay of four months." *Id.* This problematic section was only a part of a larger delay that lasted in total 298 days. *See Id.* 30-31; *see also Raihan*, 324 F. Supp. 3d at 111.

The Court in *Cavalier* relied on cases from the Eleventh Circuit and District of New York, which had held delays of eleven and three months, respectively, were "clearly unreasonable." Id. at 30-31 (citing *Williams v. Board of Regents of the University System of Georgia*, 477 F.3d 1282, 1297 (11th Cir. 2007)) (superseded by statute on other grounds); *Tubbs v. Stony Brook University*, 2016 U.S. Dist. LEXIS 28465 at *7 (D. N.Y. 2016)). As *Raihan* put it, *Cavalier* found that, in total, pleading a 298-day delay from the time a report was filed to the time the University decided not to hold her alleged assailant accountable was "just enough-to clear the motion to dismiss hurdle." *Raihan*, 324 F. Supp. 3d at 111.

The University's response in this case is remarkably similar to the objectionable response in *Cavalier*. Here, Mr. Estrada also alleged that Defendant's response was "clearly unreasonable" due to lengthy and unexplainable delays and lack of communication. From the date of initial report, January 7, to the date the university issued a finding of non-responsible, October 21, is 287 days. This timeline is remarkably similar to the one found sufficient to state a claim in *Cavalier*. Even if

17

one disregards this date and takes the July 16 date of the Title IX dismissal, that delay is still approximately six months and one week, all for a one-page dismissal that contained little substance. *See* Compl. ¶¶ 112-115. The more abbreviated timeline still fits squarely within the range of problematic delays examined in *Tubbs* and *Williams* and is itself one-month-and-a-half longer than the delay in *Cavalier*.

Mr. Estrada's allegations of deliberate indifference were not, as Defendant erroneously states, simply because he was unhappy with the outcome. *See* ECF No. 9 at 13. Nor is it an attempt "to sneak past a motion to dismiss by failing to plead material facts about what took place in the intervening months." *See* ECF No. 9 at 12. That perspective requires ignoring what Mr. Estrada actually pled.

Mr. Estrada pled a detailed factual timeline outlining every step throughout the process.[3] Any alleged "failure" to plead "material facts" is solely the result of the

---

[3] Mr. Estrada alleged, in detail, the following: (1) he reported the encounter, through a faculty-advisor on January 7; (2) he had an intake on January 9; (3) he communicated that he wished to move forward with a formal complaint on January 16; (4) his communications were ignored until March 19, despite reaching out multiple times; (5) Ms. Buchs responded that only then, two months later, was the office drafting a Notice of Allegations and assigning an investigator; (6) Mr. Estrada received the Notice and investigator assignment on April 7, three months after his initial report; (7) on April 11, the investigator, after just four days, informed Mr. Estrada that she believed the relationship did not violate policy, but he could present counter evidence; (8) on April 29 the investigator requested an interview, which occurred on May 15; (9) following the interview, an additional two months passed with very little communications; (10) on July 16 Mr. Estrada was informed that the case had been re-assigned to Ms. Buchs, who then promptly dismissed his formal complaint on July 25 in a one-page opinion confirming that the office had improperly assessed the sufficiency of the evidence in deciding to dismiss a case; (11) the dismissal of the formal complaint was affirmed on appeal with similar brevity on September 3; and (12) the office brought the saga to an end by dismissing his non-

18

University's own failure to adequately communicate with an alleged victim of sexual assault and non-consensual recording of sexual acts. Mr. Estrada's allegation plainly meet the rationale provided in *Cavalier*'s rationale regarding the University's delay.

### 2.    *Mr. Estrada also pleads other Procedural Irregularities and Deficiencies.*

In addition to the delays, Defendant's response was deliberately indifferent in multiple other ways. Although Plaintiff clearly disagrees with the University's dismissal, his Complaint is not based on the University's decisions, but rather the myriad of procedural deficiencies in its response to his Title IX and Non-Title IX complaints (See, footnote 2, supra).

One clear procedural deficiency was the University's investigation of its employee after being notified that the employee had allegedly recorded a student on University property without that student's consent (it probably deserves considering whether the University would have treated Mr. Estrada's complaint about Dean Knight the same if Mr. Estrada were a female). In fact, the University never provided Mr. Estrada any documentation that the University did anything to address Mr. Estrada's complaint that Dean Knight had recorded and/or photographed him without his consent.

By way of example, the portion of the Investigation Report provided by the University as Exhibit A to its Memorandum in Support of its Motion to Dismiss does

---

Title IX complaint by making improper credibility terminations. *See* Compl. ¶¶ at 94-151.

19

not indicate any action by the University to address Dean Knight's illicit recording. *See* ECF No. 9, Ex. A. There is nothing, to Mr. Estrada's knowledge, in the report (or in the Notice of Outcome) that indicated the University so much as asked Dean Knight to destroy any unauthorized recordings he made of his sexual encounter with Mr. Estrada.

Moreover, the University failed to report this allegation to the police or pull camera footage of the day in question (another procedural deficiency). Notably, the University took both of these actions when investigating Mr. Estrada for the *same* conduct. In other words, when a student has allegations against them, the University will get the police involved and pull camera footage. But, when it is one of their own employees, rather than taking more care due to the systemic issues noted in *Davis* and the power dynamics involved, it actually takes less care to guarantee a fair outcome. Indeed, there is nothing in any of the pleadings to suggest that the University addressed this crucial aspect of Mr. Estrada's complaint to the Title IX office in any meaningful way. An investigation that ignores the most serious alleged misconduct is not reasonable; it is bedrock deliberate indifference.

Beyond the delays and lack of remedial measures, Mr. Estrada alleged that the investigator, who had barely commenced her investigation and not interviewed either party, already made up her mind that the "relationship" was not against policy. See Compl. ¶ 104. This was not merely an inference by Mr. Estrada; it was something that the investigator stated while discussing a future interview. *See* Compl. ¶ 104. Further, Mr. Estrada alleged that his investigation was randomly re-assigned to Ms.

20

Buchs at the eleventh hour, who promptly dismissed the complaint days later. *See* Compl. ¶¶ 110-124. Mr. Estrada also alleged that the dismissal of his formal complaint was rubberstamped on appeal, without any substantive discussion of the procedural irregularities he flagged. *See* Compl. ¶¶ 129-132. Finally, Mr. Estrada alleged that his non-Title IX complaint was similarly dismissed through improper and erroneous credibility determinations. *See* Compl. ¶¶ 141-151.

Any one of these actions, standing alone, should be enough to make it past the motion to dismiss stage. When taken all together, these irregularities turn into a troublesome pattern that proves the University lacked any interest in taking Mr. Estrada's complaints seriously. These "lapses" are not mere "allegations of insensitivity, negligence, or lack of zeal." *Cavalier*, 306 F.Supp.3d at 27. They are allegations of an inexcusable abandonment of the University's obligations under Title IX.

Comparing the University's response to the response in *Doe v. District of Columbia*, 151 F.4th 435, 447 (D.D.C. 2025), makes this plain. In *Doe*, "District officials met with the Does within a day of the assault, reported the assault to the police, secured the video footage that corroborated Jane's claim, and began their own Title IX investigation." *Id.* Here, the University took none of these prompt actions. It did not interview Mr. Estrada for three months, it made no report to the police of the illicit recording, made no effort to secure the illicit images and/or videos, and delayed its own Title IX investigation for a total of six months, while not issuing a non-Title IX finding for 287 days, or approximately nine months and two weeks.

21

The events, as pled, suggest that the University did not engage in any good-faith investigation, as required by Title IX, but rather delayed and stalled in hopes of running out the clock. The allegations of delays alone fall squarely within the *Cavalier* framework, even if it is "just enough" to clear the motion to dismiss hurdle. Yet, even if one accepts the University's version of the timeline of events, which was never communicated to Mr. Estrada while the process was underway, the Complaint plausibly alleges that its response failed to address the continuous risk posed to Mr. Estrada by the recordings at all, a failure which independently satisfies the deliberate indifference standard. At a minimum, Mr. Estrada has alleged enough to gain the opportunity to further develop the factual record in discovery. If given that opportunity he will prove that the University either: (1) wholly ignored his complaints; or (2) performed a low effort, perfunctory investigation with a predetermined outcome as a formality, all in the hopes of insulating itself from a lawsuit such as this one.

### C.    Mr. Estrada Has Plausibly Alleged that the University's Inaction Left Him Vulnerable to Additional and Ongoing Harassment.

Defendant's actions, or lack thereof, left Mr. Estrada both vulnerable to future harassment and the victim of continuous harassment. As this District noted in *Doe v. Howard University*, currently, a circuit split exists as to whether a plaintiff, to satisfy the fifth element, must allege either: (1) that a school's deliberate indifference leaves him or her vulnerable to future harassment; or (2) that a school's deliberate indifference caused him or her to actually suffer subsequent harassment. *See* 396 F.

22

Supp. 3d 126, 133-34 (D.D.C. 2019). The First, Tenth, and Eleventh Circuits hold that plaintiffs can state a claim by merely alleging the indifference "caused them to be 'vulnerable to' further harassment." *See Id.* (internal citations omitted). In addition, Federal District Courts in D.C., Texas, New Mexico, and California have held similarly on various occasions. *See Id.* at 134 (collecting cases). The Eighth and Ninth Circuits "appear to require a showing of subsequent harassment." *See Id.* For its part, "[t]he D.C. Circuit has not weighed in on this issue." *Id.* at 133. It needs not do so today. Under either standard, Mr. Estrada has stated a claim, given Dean Knight's ongoing creation and ongoing retention of unauthorized images and/or videos of his encounter.

First, the University argues that Plaintiff has failed to adequately allege further harassment. *See, e.g.* ECF No. 9 at 13-14. In support, the University claims that Mr. Estrada "makes a point of pleasing that he 'never heard from Defendant Dean Knight again.'" *See* ECF No. 9 at 14. As explained in detail in Section II(A), *supra*, Mr. Estrada is alleging ongoing and continuous harassment due to the creation and retention of illicit photos and/or recordings. That argument need not be restated in detail here and is incorporated by reference. Put simply, Mr. Estrada does contend that he is victim of ongoing sexual harassment due to the possession and threat of dissemination of these unauthorized photos and/or recordings.

Defendant's argument, yet again, is consistent with its other omissions in ignoring and discounting Dean Knight's creation and retention of unauthorized images and/or videos. This additional harassment remains a threat to Mr. Estrada,

and it only remains so *because of* the University's inaction. Mr. Estrada pled this with specificity, *see* Compl. ¶ 175, but it is also the logical conclusion of every other allegation in the Complaint regarding the photos and/or recordings. *See also* Compl. ¶¶ 88-90; 93; 97; 144; 167; 187-191. In sum, Mr. Estrada plausibly alleged that he is the victim of ongoing and continuous harassment due to the University's deliberate indifference.

Second, Mr. Estrada likewise satisfies the less stringent "vulnerability" pleading standard. In *Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019), the Tenth Circuit held that such vulnerability must "reasonably deprive[] [a plaintiff] of educational opportunities available to other students." *See Id.* at 1105. Contrary to Defendant's assertions, Mr. Estrada's allegations on this point are not "vague."

Mr. Estrada alleged with specificity that "Dean Knight, absent the slightest penalty, was free to circulate the video recording or the photographs, or otherwise contact Mr. Estrada for additional sexual activity." *See* Compl. ¶ 175. In asserting that this allegation does not meet the standard, Defendant attempts to recast this allegation as: "I was harassed once, so that means I might have been harassed again—even though I was not." See ECF No. 9 at 15. First, this egregious diminishing of Mr. Estrada's allegation is emblematic of American University's attitude throughout its "investigation." Second, it attacks a strawman, instead of addressing the explicit language of Mr. Estrada's allegations.

Mr. Estrada specifically alleged "[t]he harassment . . . resulted in the loss of educational benefits in the form of Mr. Estrada's student organization memberships

24

lasting up to his departure from the University, his struggles to complete schoolwork, and his struggles to attend classes during that time." *See* Compl. ¶ 168. This is not a conclusory statement; it's a recounting of Mr. Estrada's actual experience. After the incident with Dean Knight, in his remaining time with the University, Mr. Estrada struggled to do all the above. It is the University who resorts to conclusory statements, by claiming that Mr. Estrada "identifies no educational opportunities or benefits of which he was deprived." *See* ECF No. 9 at 15. To the contrary, Mr. Estrada alleged that he lost the enjoyment of his student organization memberships and could no longer sufficiently complete his schoolwork or attend class.

It almost goes without saying that this is also the logical conclusion of Mr. Estrada's allegations. Presumably, and hopefully, no other student at the University during this time had to deal with the specter of potential "revenge porn" from a senior administrator hanging over their heads as they tried to go about their studies and normal collegiate life. The existence of such compromising material, and the University's total lack of action to remedy it, obviously "deprived [Mr. Estrada] of educational opportunities available to other students." *See Farmer*, 918 F.3d at 1105.

As indicated above, the University's inaction exacerbated Plaintiff's vulnerability. The University took no steps to secure the illicit recordings, prevent their dissemination, or separate Plaintiff from the source of harm. This inaction plausibly left Plaintiff exposed to ongoing harassment, satisfying the fifth element under either line of authority.

25

### III.    Mr. Estrada Has Adequately Pledged a Breach of Contract Between Himself and the University.

The University had a valid contract with Mr. Estrada. Specifically, the University's Title IX Sexual Harassment Policy applied to students, the University and made certain promises to protect students, and the University also required students and faculty to act according to certain rules and procedures. *See* Policy.[4] As explained in the Complaint, "[b]y failing to investigate Dean Knight, the University breached [this] contract with Mr. Estrada through violating its promise to prohibit sexual harassment and misconduct, instead tolerating it by allowing Dean Knight to escape unaffected." Compl. ¶ 182.

In D.C., breach of contract claims have four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 595 (D.C. 2023) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). This Court has, on numerous occasions, found "the relationship between a university and its students [to be] contractual in nature."

---

[4] The University's Title IX Sexual Harassment Policy is incorporated by reference in Plaintiff's Complaint because it is integral to Plaintiff's claims. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself. Because the contract is a legally operative document that is a necessary element of the claim, the contract is "integral" to the plaintiff's claim—it form[s] the basis for a claim or part of a claim. A pleading's reference to even a part of a fully integrated and authentic contract thus incorporates the contract as a whole into the complaint." (alteration in original) (footnote omitted) (citation omitted)).

*Chenari v. George Washington Univ.*, 172 F. Supp. 3d 38, 47 (D.D.C. 2016) (quoting *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007)). University policies, such as the one in question, the American University Title IX Sexual Harassment Policy, "'must be viewed as a whole' and 'the court should view the language of the document as would a reasonable person in the position of the parties.'" *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1976)).

Here, the University argues the policy is merely a putative promise to prohibit sexual harassment. In making this argument, however, the University ignores that this District found a previous version of the policy to be a contract, stating that "a contractual relationship exists between the University and Doe, and that the Student Code of Conduct and the Discrimination and Sexual Harassment Policy form a part of that relationship." *Doe v. American Univ.*, No. 19-cv-03097 (APM), 2020 WL 5593909, at *11 (D.D.C. Sept. 18, 2020) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977)).

Accordingly, *Doe v. American University* is instructive. There, the plaintiff brought a breach of contract claim under the Student Code of Conduct and the Discrimination and Sexual Harassment Policy. *Id.* The court found that the 2016 version of the Discrimination and Sexual Harassment created the existence of an enforceable contract. *Id.* at *11–12. This is because it "set forth specific procedures that both the student and University must follow, and they show both parties' clear intent to be bound." *Id*. at *11. Specifically, the policy stated:

> This policy covers all faculty, staff, and students of American University, applicants for admission and employment, as well as vendors, guests, and contractors ("AU Community"). This policy applies to all University programs and activities. The University will address complaints related to an AU Community member's participation in those programs and activities, regardless of whether the offending conduct occurred on or off campus. The policy is intended to be consistent with the provisions of applicable local and federal laws and regulations.

*Id.* at *12. The policy continued with statements such as "'[t]he University *will* address complaints,' and the 'Designated Official ... *will* determine which process' to use." *Id.* (emphasis in original). The policy then set forth prohibited conduct. *Id.* This demonstrated "an intent to be bound and a mutuality of obligation" because "the University's Code and Policy impose obligations and requirements on the University itself." *Id.* at *12–13.

The court denied dismissal of the breach of contract claim (and the related implied-covenant claim) on three specific theories: (1) the University's failure to honor the one-year limitations period in the 2016 Code for filing sexual-assault complaints; (2) procedural irregularities in the investigation and sanctioning process; and (3) denial of the right to request recusal of biased panel members. *Id.* at *18. These promises were not vague pronouncements; they were commitments that the University gave to students. *Id.* at *13 (distinguishing cases rejecting claims based on purely aspirational language).

The same analysis applies here, where the relevant University policy in this case contains language materially identical to the policies at issue in *Doe v. American University*, which appear to be a prior version of the subject policy in this case. The scope of the Title IX Sexual Harassment Policy states:

28

> Members of the University community covered by this Policy include, but are not limited to, faculty, staff, and students of American University, and related third-parties (such as applicants for admission and employment, vendors, guests, contractors, and program participants) (collectively "AU Community"). This Policy applies to all University education programs and activities in the United States, whether on or off campus. The University will address complaints related to an AU Community member's participation in those programs and activities.

Policy at 1. The policy continues:

> American University does not discriminate on the basis of sex in the education program or activity that it operates, which includes admission and employment. Consistent with the procedures set forth and referenced in this Policy, *the University will take steps to eliminate Title IX Sexual Harassment, prevent its recurrence, and remedy any discriminatory effects* for members of the AU Community.

Policy at 1–2 (emphasis added). Continuing, it states:

> The Title IX Coordinator or designee, in consultation with the appropriate university administrator responsible for resolving the additional allegations, *will* assess the information in order to determine which process *will* be used for resolving the additional allegations.

*Id.* at 2 (emphasis added). And:

> The University *will* respond promptly to Title IX Sexual Harassment, as defined under this Policy, when the University has actual knowledge of Title IX Sexual Harassment in its education programs and activities that occurs against a person in the United States. The University *will* take appropriate action in response to a report of Title IX Sexual Harassment pursuant to this Policy.

*Id.* at 3 (emphasis added). The policy continues to state an affirmative duty that once the University has "actual knowledge" of the report, it will "respond promptly," "take appropriate action," offer supportive measures, and eliminate the harassment and its effects. Policy at 2–3. The policy also requires the University to allow complainants an equitable opportunity to present information and evidence and requires the

29

University investigator to "conduct a prompt, thorough, fair and impartial investigation." Policy at 14–17.

As in *Doe v. American University*, the policy applies to both students and the University. And the policy does not include mere aspirational statements; it includes precise, definite promises that, as the court held in *Doe v. American University*, create contractual obligations. As in *Doe v. American University*, the policy stated the University *will* take these actions. The language mirrors—and in many places tracks verbatim—the assurances in the 2016 Code and Policy that this District found contractually binding.

Mr. Estrada's Complaint pleads facts that, as viewed in the light most favorable to him, establish both the existence of the contract and its breach. First, the policy was in effect and visible to all students, and Mr. Estrada was a student in good standing at the University. Compl. ¶¶ 9–15. Second, Mr. Estrada reported that Defendant Dean Knight—an Assistant Dean with supervisory authority over him— video-recorded sexual activity involving the two of them without consent. Compl. ¶¶ 76–93. That conduct squarely constitutes Title IX Sexual Harassment under the policy's definitions. Policy at 5–6. Third, once the University had "actual knowledge," it had certain duties to respond promptly and protect Mr. Estrada and conduct a thorough investigation. Policy at 2–3; 14–17. Instead, the University "turned a blind eye and ignored his complaints," "failed to protect Mr. Estrada's rights," and "allowed the Dean to remain in a position of authority over other students." Compl. at 1; *see also* Compl. ¶¶ 94–132 (detailing the University's failure to investigate); Compl. ¶¶

30

16–40 (detailing the University's documented pattern of stonewalling Title IX investigations, particularly faculty-on-student misconduct). These allegations resemble the procedural and substantive breaches that survived dismissal in *Doe v. American University*.

Accordingly, because the Title IX Sexual Harassment Policy contains specific, definite promises forming an enforceable contract, and because Mr. Estrada has pled concrete facts showing that the University failed to honor those promises after receiving actual knowledge of non-consensual sexual recording by a Dean, the breach of contract claim is plausibly stated and should not be dismissed. If the Court is inclined to dismiss this claim, Mr. Estrada would ask for the opportunity to amend his Complaint to add the specific violations of the policy to the Complaint.

## IV.    Dismissal with prejudice is improper.

At a minimum, even if this court finds that Mr. Estrada has not stated a claim, dismissal with prejudice would be improper. "Given the preference voiced in the Federal Rules of Civil Procedure for resolving disputes on their merits, "[d]ismissal with prejudice is the exception, not the rule, in federal practice." *Dentons US LLP v. Republic of Guinea*, 208 F. Supp. 3d 330, 338 (D.D.C. 2016) (quoting *Rudder v. Williams*, 666 F.3d 790, 794, (D.C. Cir. 2012)). "Accordingly, the 'standard for dismissing a complaint with prejudice is high: dismissal with prejudice is warranted only when . . . the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Id.* (internal citations omitted).

31

Defendant cannot meet the "high standard" necessary to show this case should be dismissed with prejudice. Defendant's argument for why such dismissal would be proper, on both counts, relies on misrepresentations of Mr. Estrada's allegations. Furthermore, it relies on arguments that have already been debunked. For example, and as stated previously, "[a] single, serious sexual assault can meet the severe, pervasive, and offensive standard." *See T.Z.*, 634 F. Supp. 2d. at 270-71. Mr. Estrada pled exactly that. *See* Compl. ¶¶ 96, 107-108. Finally, Mr. Estrada has not "admitted" that the University's response "did not cause him [to] undergo harassment nor did it make him liable or vulnerable to it." *See* ECF No. 9 at 19. As illustrated above, Mr. Estrada's allegations mean quite the opposite, as he is currently undergoing harassment as a result of the University's response. Should the Court, however, like for Mr. Estrada to plead this with further specificity, he can.

The same can be said for Mr. Estrada's breach of contract claim. Mr. Estrada can, if the Court deems it necessary, further specify the source of the promise of non-harassment that the University made. Moreover, Defendant is legally incorrect that "such a promise is purely aspirational . . . as a matter of law." *See* ECF No. 9 at 20. As mentioned in the discussion surrounding Count II, only six years ago this Court decided, against the same Defendant, that a materially identical policy to the one Mr. Estrada points to be a contract with its students. Put simply, Defendant's conclusory statements that Mr. Estrada cannot cure any potential pleading defects cannot possibly meet the "high standard" that this Court requires to show that dismissal with prejudice is warranted.

32

Should the Court so require, Mr. Estrada can amend the Complaint to further detail the University's failure to address Dean Knight's illicit recordings, identify additional policy provisions, and elaborate further on the ongoing impact of unauthorized images.

## CONCLUSION

Mr. Estrada has plausibly alleged that the University ignored allegations of non-consensual sexual recording, failed to address the ongoing existence of those recordings and the risks they posed, and left Mr. Estrada vulnerable to continuing harm, in addition to ignoring his complaint for sexual assault. Under governing precedent, those allegations are sufficient to state a claim for deliberate indifference under Title IX and breach of contract.

Dated: April 2, 2026                              Respectfully submitted,

/s/ Parker Bowman
Parker Bowman, VA227
Lindsay R. McKasson
D.C. Bar No. 1618740
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
parker@binnall.com
lindsay@binnall.com

*Counsel for Plaintiff Kris Estrada*

33

## CERTIFICATE OF SERVICE

I certify that on April 2 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record, and that a copy was sent by U.S. first class mail, to the following Defendant *pro se*:

Brad Dean Knight
130 M Street NE, Apt. 708
Washington, D.C. 20002

/s/ Parker Bowman
Parker Bowman, VA227

*Counsel for Plaintiff Kris Estrada*

34